FILED
08/07/2020
Clerk of the
Appellate Courts

IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs April 2, 2020

IN RE ADALEE H.

Appeal from the Chancery Court for White County
No. 2018-CV-86     Ronald Thurman, Chancellor

_____

No. M2019-00949-COA-R3-PT

_____

In this parental termination case, the trial court found two statutory grounds for termination of a father's parental rights: severe child abuse and failure to manifest an ability and willingness to assume custody. The trial court also found that termination of the father's parental rights was in his child's best interest. Because the record contains clear and convincing evidence to support the grounds for termination and the best interest determination, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed**

W. NEAL MCBRAYER, J., delivered the opinion of the court, in which J. STEVEN STAFFORD, P.J., W.S., and THOMAS R. FRIERSON II, J., joined.

William A. Cameron, Cookeville, Tennessee, for the appellant, Zachary H.

Laurie A. Seber, Cookeville, Tennessee, for the appellees, Anna H. and Todd H.

OPINION

I.

A.

In 2011, Anna H. ("Mother") gave birth to a daughter, Adalee H. Mother was a freshman in college, and the father, Zachary H. ("Father"), was still in high school. The unmarried parents lived with Father's parents. Mother later recounted witnessing acts of domestic violence in the home and drug use by both Father and his father. Father and his

parents fought, "mostly throwing things, shoving, screaming in each other's faces," and occasionally Father and his father got into fistfights.

Sometime before Adalee's first birthday, Mother separated from Father and moved out of the home, taking the child with her. According to Mother, she realized that there was "a more severe drug problem" in the home than she ever realized.

At first, Mother voluntarily allowed Father visitation. In 2015, a court formalized the arrangement by entering a final order of parentage, which incorporated a permanent parenting plan. The plan granted Father 130 days of parenting time, which he consistently exercised.

In January 2018, Mother petitioned to modify the permanent parenting plan and for an ex parte restraining order against Father. The petition alleged that, for "the past several months," Adalee had expressed a desire not to spend time with Father. More recently, during Father's last weekend visitation, Adalee allegedly reported that she was really scared because Father "gets mad, grabs her up, and puts her in her room." The petition also raised concerns about Father using drugs and taking the child with him to acquire drugs. For example, Father purportedly took the child to a park, leaving her alone in the car while Father left in another car with a friend. Adalee also described Father smoking a pipe with "green stuff in it."

The court entered the requested ex parte order, which prohibited Father from taking the child from Mother, and set a hearing for the following week. At the subsequent hearing, the court extended the restraining order and ordered Father to submit to a hair follicle drug screen. He did so on February 5, 2018. The drug screen came back positive for both methamphetamine and marijuana metabolite.

After expiration of the restraining order, the court temporarily modified parenting time by restricting Father to supervised visitation. The visits were to be supervised by Mother or her designee and take place at a local fast food restaurant each Sunday from 2:00 p.m. to 4:00 p.m.

Father's visits did not go well. Mother supervised the visits with her husband, Todd H. ("Stepfather"). Father was very angry at the visitations, and there were many verbal altercations between Father and Mother and Stepfather. Father would call Mother names. And Father threatened Stepfather directly and told him that he would take him outside and "bounce [his] head off the concrete" and that Stepfather "was next on his list." Police had to be called on three occasions. All this happened in the child's presence. Mother suspected that Father was "high" on some visits.

In July, Mother's request for modification of the parenting plan came on for a hearing. Father admitted past use of methamphetamine, but he claimed that he was off

drugs. The court found that Father "repeatedly took [ ]his child to drug deals." With respect to Father's supervised visitation, the court found:

> The behavior with the cursing, you know, it's not a good thing to – this is not a contempt case. There's – if this had been filed as contempt petition, the Court would have had to put [Father] in jail, because there's a prior court order that says you will not say derogatory things and curse the other parent. He's admitted he's done that. He's actually admitted he's done that to his mother, which is not good. It's not appropriate behavior.

Although it found a material change of circumstances sufficient to justify modification of the parenting plan, the court decided to leave in place the supervised visitation schedule for Father. It ordered the parties to put the case back on the court's docket for a final hearing within four to six months. In the interim, the court required Father to attend anger management classes and to submit to hair follicle drug screens upon Mother's request. Because it found that Adalee had been traumatized by Father's behavior, the court also ordered counseling for the child at Father's expense.

## B.

The final hearing on Mother's petition to modify the parenting plan never took place. In September 2018, Stepfather, joined by Mother, petitioned to terminate Father's parental rights and for adoption. The petition alleged four statutory grounds, but at trial, only two grounds were pursued: severe child abuse and failure to manifest an ability and willingness to personally assume legal and physical custody. *See* Tenn. Code Ann. § 36-1-113(g)(4), (14) (Supp. 2019).

During a one-day trial, the court heard testimony from several witnesses, including the licensed professional counselor that had conducted the court ordered counseling. The counselor met with both Mother and Father separately and then began seeing Adalee weekly in September 2018. During the sessions, the child recounted events preceding Mother's petition to modify the parenting plan. Adalee described witnessing domestic violence frequently in Father's home among Father, Father's mother, and Father's father. According to the child, physical altercations, yelling, screaming, and cursing occurred at almost every visit with Father. She also described chairs being thrown. Adalee said that several times she got between the fighting parties in an effort to stop the fighting. In one such instance, the child claimed that she was knocked down and hurt her arm.

According to the counselor, Adalee said the police were called as a result of one domestic incident at Father's home. She claimed that her grandmother, Father's mother, locked her and her half-sister in the bedroom so that they could not speak with the police. Adalee recalled screaming and crying to speak with the policeman so that the policeman could return her to her mother.

3

Adalee was aware of Father's drug usage. According to the child, Father would take her and her younger half-sister in the car to a store or a house and leave the girls in the car unattended. Father would go to the other side of the building, and when he returned, she said he had "the green stuff that smells bad" that her father would smoke. Adalee told the counselor she was very frightened when he would leave her in the car, but she had to be brave because she had to take care of her younger half-sister.

Adalee also was very frightened by the sleeping arrangements at Father's home. Sometimes she slept with her father, but other times, she slept on the couch. Adalee reported waking up to see random men sleeping on the floor next to her, her father's friends. She explained that she was not comfortable around Father's friends because they also did drugs. Adalee said that she knows when her father is doing drugs because he acts differently. She said he talks differently and acts sleepy.

By late 2018, the counselor felt that Adalee was showing progress and moved from weekly to biweekly sessions. But in January 2019, the weekly sessions resumed after the child's first grade teacher reported that Adalee had expressed suicidal ideations at school. The teacher, who also testified, said that the child had stabbed her own hand with a pencil.

Following the incident at school, the counselor recommended ceasing supervised visitation with Father and Father's mother, who would sometimes accompany Father for the visits. The counselor based her recommendation on the child's "significant deterioration of mental health" due to the conflicts she experienced at the supervised visits.

Initially, the counselor diagnosed Adalee with adjustment disorder with anxiety due to child abuse and neglect. After several months and given her sustained symptoms, the counselor also diagnosed Adalee with post-traumatic stress disorder. The counselor found no indication of either physical or sexual abuse. But the counselor opined that Adalee had been subjected to domestic abuse in the form of "[c]oercion and threats, intimidation, emotional abuse, isolation, minimizing, denying, and blaming." The counselor further opined that the perpetrators of the abuse were Father and his family.

Father also testified. He described having a problem with drugs since he was 13 years old. Father said he started with "pain pills, and then went to meth." Before he realized what he was doing or how bad it was, at age 15 or 16, he was addicted. In Father's words, "Most kids are wanting [sic] to get a car, and I'm over here doing drugs with 45-year-old men." Although he denied that his parents provided him with drugs, he admitted to doing drugs with his father. He described his father as an "addict."

4

Father also admitted to domestic violence in his home when he was growing up. He said that his father, his mother, and he "always fought like cats and dogs" and acknowledged that Adalee had told the truth about that. But he denied reports that he had pulled a knife or gun on his mother as Adalee had reported to her counselor. His father had pulled a knife on his mother. Father's mother testified that arguments between her son and his father would occasionally get into physical altercations. She explained that her husband, Father's father, would threaten her "when he was not himself" and Father would try to protect her.

At first, Father objected to the characterization that he had taken Adalee on "drug runs." Father testified:

> What y'all call a drug run is what I call going to meet my best friend since I was three years old. You know, yeah, we smoked weed together, but he was my friend since three years old. The living room you all are talking about that [Adalee] went to the house y'all keep on talking about, that was my childhood best friend's home. We didn't do drugs in there while she was in there. I went to my childhood best friend's home. Which, he had kids, too, and they played out in the front yard. That's the drug homes y'all are talking about me going to.

When reminded of his prior testimony as part of Mother's petition to modify parenting plan, Father conceded that there were other times he brought Adalee around drug dealers. But Father explained that he trusted the dealers to be around his child "[b]ecause a lot of times it was my dad and uncles and people in my family."

At trial, Father claimed he was no longer doing drugs. Father did not attend a drug rehabilitation program. Instead, he went to what Father described as "an herb guy." Father's cousin testified that Father saw an herbalist for treatment of his drug addiction. According to Father, the herbalist "grows all this stuff to help you from anything in the world, from cancer, diabetes, to - - whatever your problem is, he can get you fixed." Father did not know the herbs he had taken, but he agreed the process might be described as a "detox." It made Father "dog sick" for three weeks such that he was unable to get out of bed.

Along with the herbs, in order to combat his addiction, Father isolated himself by locking himself in his bedroom for three weeks and did not talk to his friends and half of his family members. Father testified that he had taken two hair follicle screens, once on his own initiative in May 29, 2018, and a second at Mother's request on September 4, 2018. Father testified that both tests were negative.

At the conclusion of the trial, the court terminated Father's parental rights. The trial court concluded that the evidence was clear and convincing that Father had

5

committed severe abuse and that he had failed to manifest an ability and willingness to assume legal and physical custody of his child. The court also concluded that the evidence was clear and convincing that termination of Father's parental rights was in the child's best interest.

## II.

Appealing the termination of his parental rights, Father raises three issues. He contends that the trial court abused its discretion in excluding laboratory reports from Father's negative drug screens. He contends that the evidentiary burden was not met for either statutory ground for parental termination relied on by the trial court. Finally, he contends that the evidentiary burden was not met on the question of the child's best interest.

Tennessee Code Annotated § 36-1-113 sets forth both the grounds and procedures for terminating parental rights. *In re Kaliyah S.*, 455 S.W.3d 533, 546 (Tenn. 2015). Parties seeking termination of parental rights must first prove the existence of at least one of the statutory grounds for termination listed in Tennessee Code Annotated § 36-1-113(g). Tenn. Code Ann. § 36-1-113(c)(1). If one or more statutory grounds for termination are shown, they then must prove that terminating parental rights is in the child's best interest. *Id.* § 36-1-113(c)(2).

Because of the constitutional dimension of the rights at stake in a termination proceeding, parties seeking to terminate parental rights must prove both the grounds and the child's best interest by clear and convincing evidence. *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010) (citing Tenn. Code Ann. § 36-1-113(c); *In re Adoption of A.M.H.*, 215 S.W.3d 793, 808-09 (Tenn. 2007); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002)). This heightened burden of proof serves "to minimize the possibility of erroneous decisions that result in an unwarranted termination of or interference with these rights." *Id.* "Clear and convincing evidence" leaves "no serious or substantial doubt about the correctness of the conclusions drawn from the evidence." *Hodges v. S.C. Toof & Co.*, 833 S.W.2d 896, 901 n.3 (Tenn. 1992). It produces a firm belief or conviction in the fact-finder's mind regarding the truth of the facts sought to be established. *In re Bernard T.*, 319 S.W.3d at 596.

We review the trial court's findings of fact "de novo on the record, with a presumption of correctness of the findings, unless the preponderance of the evidence is otherwise." *In re Taylor B.W.*, 397 S.W.3d 105, 112 (Tenn. 2013); Tenn. R. App. P. 13(d). We then "make [our] own determination regarding whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, provide clear and convincing evidence that supports all the elements of the termination claim." *In re Bernard T.*, 319 S.W.3d at 596-97. We review the trial court's conclusions of law de

novo with no presumption of correctness. *In re J.C.D.*, 254 S.W.3d 432, 439 (Tenn. Ct. App. 2007).

A.

The evidentiary issue raised by Father relates to laboratory reports from hair follicle drug screens performed on Father. Both Mother and Father testified about the hair follicle screens and test results. In cross-examination, Father's counsel asked Mother if she knew of Father's two negative hair follicle drug screens in 2018. She testified that she knew of both tests and knew that they were both negative. Father's counsel then offered the laboratory reports showing the negative results into evidence. Mother's counsel objected on the basis of authenticity, and the court sustained the objection. The court granted counsel's request to make an offer of proof, but counsel only asked Mother a couple of questions regarding whether she requested that Father submit to the September 2018 test.

The admission or exclusion of evidence is within the trial court's discretion. *In re Melanie T.*, 352 S.W.3d 687, 698 (Tenn. Ct. App. 2011); *White v. Vanderbilt Univ.*, 21 S.W.3d 215, 222 (Tenn. Ct. App. 1999) (citing *Seffernick v. Saint Thomas Hosp.*, 969 S.W.2d 391, 393 (Tenn. 1998); *Otis v. Cambridge Mut. Fire Ins. Co.*, 850 S.W.2d 439, 442 (Tenn. 1992)). Although the discretionary nature of the decision does not shield it completely from appellate review, it does result in less rigorous appellate scrutiny. *White*, 21 S.W.3d at 222 (citations omitted). In reviewing discretionary decisions, we consider "(1) whether the factual basis for the decision is properly supported by evidence in the record, (2) whether the [trial] court properly identified and applied the most appropriate legal principles applicable to the decision, and (3) whether the [trial] court's decision was within the range of acceptable alternative dispositions." *Lee Med., Inc. v. Beecher*, 312 S.W.3d 515, 524 (Tenn. 2010).

Before evidence may be admitted, the authenticity or identity of the evidence must be established. Tenn. R. Evid. 901(a). Authentication "is satisfied by evidence sufficient to the court to support a finding by the trier of fact that the matter in question is what its proponent claims." *Id.*

The court did not abuse its discretion in sustaining the objection to the admission of the laboratory reports. Father argues that the reports were authenticated through Mother's testimony because "she had personal knowledge that the Appellant passed [the drug tests]." Such testimony falls short of authenticating the lab reports. *See* 32A C.J.S. Evidence § 1086, Westlaw (database updated 2020) ("Authentication relates only to whether the documents originate from their alleged source, and is not synonymous with vouching for the accuracy of the information contained in those records."). Father can point to no evidence establishing that the reports were what he claimed them to be, only evidence that Mother and he were familiar with the results of the reports.

7

B.

Father challenges both grounds for termination of parental rights. He claims that a finding of severe child abuse was inappropriate because he had remedied both the domestic violence issues in his home and his drug problems. He also takes issue with the counselor's testimony. Father contends that he manifested both a willingness and ability to assume custody of his child by "remedy[ing] his drug problem, tak[ing] positive steps to remedy his anger issue, and continu[ing] to pay child support." He further contends that placing the child in his custody would not pose a risk of substantial harm to the child.

1. Severe Child Abuse

Under Tennessee Code Annotated § 36-1-113(g)(4), a parent's rights may be terminated if "[t]he parent . . . has been found to have committed severe child abuse as defined in § 37-1-102, under any prior order of a court or is found by the court hearing the petition to terminate parental rights . . . to have committed severe child abuse against any child." Tenn. Code Ann. § 36-1-113(g)(4). Among other things, "severe child abuse" means,

> [s]pecific brutality, abuse or neglect towards a child that in the opinion of qualified experts has caused or will reasonably be expected to produce severe psychosis, severe neurotic disorder, severe depression, severe developmental delay or intellectual disability, or severe impairment of the child's ability to function adequately in the child's environment, and the knowing failure to protect a child from such conduct . . . .

*Id.* § 37-1-102(27)(B) (Supp. 2019).

Here, a licensed professional counselor diagnosed the child as suffering from adjustment disorder with anxiety due to child abuse and neglect and PTSD. The child's teacher testified as to some of the ways those diagnoses played out in Adalee's life. The child often complained of feeling sick and needing to vomit, so much so that the teacher kept a trashcan next to the child's desk. The child also left school early several times as a result of getting sick. The child told the teacher multiple times that she did not want to go to visitation with Father. Later the child attempted to harm herself to avoid even the supervised visits.

Mother also testified to the distress Adalee exhibited at the prospect of visiting with Father. As visitation went on, Adalee's behavior became progressively worse. The child would be very clingy at bedtime, and Mother would have to lie down with her the night before visits to Father's house. Father's behavior at the supervised visits did nothing to improve matters. After supervised visits, Adalee expressed fear that her father

would come to get her. Before going to bed, she would insist that Mother and Stepfather walk through the house to make sure the doors were locked. And she experienced nightmares from which she would wake sweating, crying, and shaking.

Even after the court suspended the supervised visitation in January 2019, the counselor testified that Adalee still struggled with fear, nightmares, and anxiety. According to the counselor, Adalee reported "having dreams that her birth father and paternal family and his friends [we]re going to break into her mother's home and kill her mother and kidnap her and take her away." Although the counselor believed the child was improving, the counselor noted that there were still things connected to past experiences with Father that triggered anxiety, headaches, and stomachaches for Adalee.

The counselor opined that Adalee was the victim of abuse by Father and his family. Father conceded many of the facts that formed the basis of the counselor's opinion. He admitted that Adalee was present during incidents of domestic violence at the home of his father and mother. He acknowledged calling Mother names and threatening Stepfather in front of Adalee at supervised visits. Father denied using drugs in the child's presence. But he testified that Adalee "maybe . . . s[aw] a joint, or, you know, little end of a green piece of what [he] call[ed] marijuana, at the end of [a] roll of paper." And Father had taken Adalee with him to places where he used or acquired drugs.

We conclude the evidence clearly and convincingly supports the finding that Father committed severe child abuse. While Father may have taken steps to stop his use of drugs and to remove his father from his life, the proof established that the abuse had taken place.

2. Failure to Manifest an Ability and Willingness to Assume Custody or Financial Responsibility for the Child

The court also found termination of parental rights appropriate under Tennessee Code Annotated § 36-1-113(g)(14). Under this ground, a parent's rights may be terminated if he

> [1] has failed to manifest, by act or omission, an ability and willingness to personally assume legal and physical custody or financial responsibility of the child, and [2] placing the child in the person's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child.

Tenn. Code Ann. § 36-1-113(g)(14). Both prongs must be established by clear and convincing evidence. *See In re Cynthia P.*, No. E2018-01937-COA-R3-PT, 2019 WL 1313237, at *8 (Tenn. Ct. App. Mar. 22, 2019).

9

The court found that the first prong, failure to manifest an ability and willingness to assume custody, had been established, and we agree.[1] The court limited Father to supervised visitation due to Father's positive drug test and admission that he had been a long term user of drugs. Although Father claimed to have stopped using drugs, the court questioned Father's credibility. And the court remained unconvinced that any recovery from the use of methamphetamine could be lasting without participation in a drug rehabilitation program. No proof was offered concerning the efficacy of the "herbs" that Father had taken.

The court found that Father clearly had an anger problem. Mother and Stepfather testified that he was confrontational and made threats. Although Father admitted to being "erratic at times" and calling Mother names and threatening Stepfather at supervised visits, Father denied having an anger problem or being given to outbursts. According to Father, he just "had that little grit about me." In July 2018, the court ordered Father to attend anger management classes. But as of April 2019, Father had only attended seven classes.

The court also found that Father was $16,000 in arrears in child support. Despite being ordered to pay for his child's counseling, Father had not done so. At age 24, Father still lived with his mother. He had never lived on his own. But the court acknowledged that Father had also been the victim of domestic abuse as a child.

The evidence is equally clear and convincing that returning the child to Father's custody would pose a risk of substantial harm to Adalee's psychological welfare. In the counselor's expert opinion, continued exposure to a culture of drugs and domestic violence would increase Adalee's PTSD and anxiety. The counselor feared that, with continued exposure, Adalee's diagnosed adjustment disorder would move to generalized anxiety. The counselor described generalized anxiety as a lifelong disorder as opposed to an episodic period of anxiety. She was of the opinion that Father's visitation should cease.

---

[1] This Court has split over the proper interpretation of the first prong of Tennessee Code Annotated § 36-1-113(g)(14). *See In re Ellie K.*, No. M2019-01269-COA-R3-PT, 2020 WL 1943522, at *9-11 (Tenn. Ct. App. Apr. 23, 2020) (describing the Court's differing views on the first prong). The split concerns whether a parent must fail to manifest *both* an ability and willingness to assume custody or financial responsibility or whether a parent must fail to manifest *either* an ability or willingness to assume custody or financial responsibility. *Compare In re Ayden S.*, No. M2017-01185-COA-R3-PT, 2018 WL 2447044, at *7 (Tenn. Ct. App. May 31, 2018) *with In re Amynn K.*, No. E2017-01866-COA-R3-PT, 2018 WL 3058280, at *14 (Tenn. Ct. App. June 20, 2018). Here, under either view, Stepfather met his burden of proof.

C.

The final issue raised by Father concerns Adalee's best interest. Because "[n]ot all parental misconduct is irredeemable," our parental termination "statutes recognize the possibility that terminating an unfit parent's parental rights is not always in the child's best interests." *In re Marr*, 194 S.W.3d 490, 498 (Tenn. Ct. App. 2005). So even if a statutory ground for termination is established by clear and convincing evidence, we must also determine whether termination of parental rights is in the child's best interests. Tennessee Code Annotated § 36-1-113(i) lists nine factors that courts must consider in making a best interest analysis. The "factors are illustrative, not exclusive, and any party to the termination proceeding is free to offer proof of any other factor relevant to the best interests analysis." *In re Gabriella D.*, 531 S.W.3d 662, 681 (Tenn. 2017). In reaching a decision, "the court must consider all of the statutory factors, as well as any other relevant proof any party offers." *Id.* at 682. The best interest analysis is a fact-intensive inquiry, and each case is unique. *White v. Moody*, 171 S.W.3d 187, 193-94 (Tenn. Ct. App. 2004).

The focus of this analysis is on what is best for the child, not what is best for the parent. *In re Marr*, 194 S.W.3d at 499. Additionally, the analysis should take into account "the impact on the child of a decision that has the legal effect of reducing the parent to the role of a complete stranger." *In re C.B.W.*, No. M2005-01817-COA-R3-PT, 2006 WL 1749534, at *6 (Tenn. Ct. App. June 26, 2006). Although "[f]acts relevant to a child's best interests need only be established by a preponderance of the evidence, . . . the combined weight of the proven facts [must] amount[ ] to clear and convincing evidence that termination is in the child's best interests." *In re Carrington H.*, 483 S.W.3d 507, 535 (Tenn. 2016).

After considering all the statutory factors, the trial court determined that termination of parental rights was in the child's best interest. The first two statutory factors look at the parent's current lifestyle and living conditions. The first factor focuses on whether the parent "has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the [parent's] home." Tenn. Code Ann. § 36-1-113(i)(1). The second factor considers the potential for lasting change. *See id.* § 36-1-113(i)(2) (asking "[w]hether the parent . . . has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible"). The court found both factors favored termination.

The court noted Father's testimony that he had been drug free for over a year at the time of trial. But the court also noted a "number of discrepancies" in Father's testimony. So the court declined to accept Father's testimony absent "some documentary proof." We defer to the court's credibility assessment. *See Watson v. Watson*, 309

S.W.3d 483, 490 (Tenn. Ct. App. 2009). The trial court also found that Father's failure to complete anger management showed a lack of potential for lasting change.

The third and fourth factors focus on the parent's relationship with the child. The third factor focuses on the consistency of visitation. Tenn. Code Ann. § 36-1-113(i)(3). The fourth factor considers "[w]hether a meaningful relationship has otherwise been established between the parent . . . and the child." *Id.* § 36-1-113(i)(4). Although Father and the child had a meaningful relationship when the child was younger, the court found the relationship had been damaged beyond repair. The counselor testified that there had been "pretty significant damage" to the child "in regard to trust, attachment, and bonding," and the counselor expressed doubt that the damage could be repaired.

The fifth factor evaluates the effect a change in caregivers would have on the child's emotional, psychological, and medical condition. *Id.* § 36-1-113(i)(5). The trial court found that it would be detrimental to the child to continue with Father's visitation based on the counselor's testimony and recommendation against continued visitation by Father.

Under the sixth factor, the court determines whether the parent or another person residing with the parent "has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child" or another person in the home. *Id.* § 36-1-113(i)(6). The seventh factor focuses on the parent's home environment and ability to be a safe and stable caregiver. *See id.* § 36-1-113(i)(7) ("Whether the physical environment of the parent's . . . home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of [intoxicants] as may render the parent . . . consistently unable to care for the child in a safe and stable manner[.]"). The trial court found that there was ample proof of the sixth factor based on the fact that Father's mother had to get an order of protection against Father's father. And there was evidence of physical and verbal altercations among the members of Father's family. But the court could not determine whether such conduct was ongoing in light of the fact that Father's father no longer lived in the home with Father and his mother.

The eighth statutory factor evaluates the parent's mental and emotional health, asking "[w]hether the parent's . . . mental and/or emotional status would be detrimental to the child or prevent the parent . . . from effectively providing safe and stable care and supervision for the child." *Id.* § 36-1-113(i)(8). The court also determined that this factor favored termination. Father did not complete his court ordered anger management classes. And Father denied having an anger problem. The court also did not find Father's self-serving statements and the testimony of his cousin and mother compelling evidence that Father had successfully, or even seriously, addressed his drug addiction.

The ninth factor considers the parent's child support history. *See id.* § 36-1-113(i)(9). Here, Father had a substantial child support arrearage.

The evidence does not preponderate against the trial court factual findings. And we conclude that the combined weight of the proven facts amounted to clear and convincing evidence that termination of Father's parental rights was in the child's best interest.

## III.

The record contains clear and convincing evidence to support terminating Father's parental rights on the two statutory grounds presented. The record also contains clear and convincing evidence that termination is in the child's best interest. So we affirm the termination of Father's parental rights.

_____
W. NEAL MCBRAYER, JUDGE